**LAW OFFICE OF STEWART KATZ**
STEWART KATZ, SBN #127425
555 University Avenue, Suite 270
Sacramento, California 95825
Telephone: (916) 444-5678

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELINA REYNOLDS; ELIZABETH BASQUEZ-PROCTOR; ANITA GARCIA-LOPEZ;<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SACRAMENTO; JOSE LEMUS; MICHAEL FRENCH; and DOES 1 through 10;<br><br>Defendants.<br>_____/ | [COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND STATE LAW [42 U.S.C. SECTION 1983]<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Angelina Reynolds, Elizabeth Basquez-Proctor, and Anita Garcia Lopez, complain and allege as follows:

## I. JURISDICTION

1. This Complaint seeks, inter alia, damages pursuant to Title 42 U.S.C. sections 1983 and 1988, for violation of plaintiffs' civil rights. Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and 1343. This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. section 1367.

## II. VENUE

2. Plaintiffs' claims alleged herein arose in the County of Sacramento, California. Venue lies in the Eastern District of California pursuant to 28 U.S.C. section 1391(b)(2).

///

## III. INTRODUCTION

3. This case shows the willingness on the part of the Sacramento County Sheriff's Department and its detectives and deputies to think creatively outside the box of American law enforcement norms from the nineteenth century to the present.

4. Seemingly drawing inspiration from the Gestapo's policy of *Sippenhaft*, North Korea's practice of three generational punishment and Assad's Syrian secret police, these innovative sheriff's department deputies (the names of some of whom are presently unknown) decided to arrest and hold as hostages the half-sister, mother and grandmother of a suspect, hereinafter "RJS", whom they were looking to speak with in connection with a homicide. The officers made it plainly known that they wanted RJS to learn that they had taken hostage the plaintiffs Angelina Reynolds, Elizabeth Basquez-Proctor and Anita Garcia-Lopez in the hope that RJS be incentivized to turn himself in sooner rather than later.

5. Despite having done nothing wrong, the three plaintiffs were handcuffed and taken to multiple locations, including homes and a bowling alley, so that they could be paraded in front of friends and family members to advertise the fact that they had been taken hostages. All three of the women were arrested on baseless charges of being accessories to a homicide after the fact. None of the women, despite being kept in custody for as long as five days, were charged with any crime, and instead they were each given documentation of the legal fiction that they had not been arrested, but only detained. The husband of plaintiff Lopez, who is RJS's grandmother, posted $100,000.00 bail to secure her release after two nights in custody. Plaintiff Reynolds' suffering was compounded while she was in custody because she was denied access to her essential medications. Plaintiff Basquez-Proctor was threatened with losing the custody of her child should RJS not surrender.

6. There was, additionally, a warrantless, non-consensual search of Lopez's home. In addition, the officers illegally seized and searched the contents of all of the three hostages' cell phones hours prior to obtaining a search warrant. The deputies' refusal to

accept the plaintiffs' lack of knowledge regarding RJS's whereabouts and the punitive measures they took in response, despite the fact that the answers given were honest, is illustrative of the inherent problem of using extreme measures of interrogation. Such measures create a situation in which the victims might be tempted to give false information simply to satisfy the deputies, although the plaintiffs in this case did not yield to this temptation.

7. Prior to being arrested, the hostages had all attempted to cooperate with law enforcement, including by truthfully sharing the limited information they had regarding RJS's location.

## IV. PARTIES

8. Plaintiff Angelina Reynolds (hereinafter "Reynolds") is the mother of RJS and plaintiff Elizabeth Basquez-Proctor and the daughter of plaintiff Garcia-Lopez.

9. Plaintiff Elizabeth Basquez-Proctor (hereinafter "Baquez-Proctor") is the half-sister of RJS, the daughter of plaintiff Reynolds and the granddaughter of plaintiff Garcia-Lopez.

10. Plaintiff Anita Garcia-Lopez (hereinafter referred to as "Lopez") is sixty-two years old, and the mother of plaintiff Reynolds and the grandmother of plaintiff Basquez-Proctor and RJS.

11. Defendant Jose Lemus (Badge #1459) (hereinafter referred to as "Lemus") was, during all times mentioned, a detective employed by Sacramento County/Sacramento County Sheriff's Department. All of the actions committed by and attributed to Lemus were performed under color of state law and putatively in the course of his employment.

12. Defendant Michael French (Badge #30); (hereinafter referred to as "French") was, during all times mentioned, a detective employed by Sacramento County/Sacramento County Sheriff's Department. All of the actions committed by and attributed to French were performed under color of state law and putatively in the course of his employment.

13. The true names and identities of defendants Does 1 through 5 are presently unknown to plaintiffs. Plaintiffs allege that each defendant Doe 1 through 5 was employed

by the County of Sacramento/Sacramento Sheriff's Department at the time of the conduct alleged and was responsible for the acts and/or omissions which resulted in plaintiffs' injuries, including their arrest and the search of their phones, the warrantless search of Reynolds' home, and the violation of their constitutional rights. Plaintiffs will seek to amend this Complaint as soon as the true names and identities of defendant Does 1 through 5 have been ascertained.

14. The true names and identities of defendant Does 6 through 10 are presently unknown to plaintiffs. Plaintiffs allege that each of defendant Does 6 through 10 was employed by the City of Sacramento/Sacramento Police Department at the time of the conduct alleged and was responsible for the acts and/or omissions which resulted in plaintiffs' injuries, including their arrest and the search of their phones, the search of Reynolds' home, and the violation of their constitutional rights. Plaintiffs will seek to amend this Complaint as soon as the true names and identities of defendant Does 6 through 10 have been ascertained.

15. Defendant County of Sacramento, which operates the Sacramento County Sheriff's Department, is a political subdivision of the State of California, created and existing by virtue of the laws of the State of California (hereinafter referred to as "County of Sacramento.")

## V. COMPLIANCE WITH CALIFORNIA'S TORT CLAIM PROCEDURES

16. Plaintiffs filed timely government tort claims with the County of Sacramento on or about November 9, 2017, as a precondition to the state law claims alleged in this action.

17. Plaintiffs' tort claims were rejected through a letter dated January 11, 2018.

## VI. FACTUAL ALLEGATIONS

18. On May 11, 2017, there was a double homicide in Sacramento County. In connection with that crime, the Sacramento County Sheriff's Department sought to contact RJS, who was twenty-one years old at the time and had no criminal record. RJS is the half-brother of Basquez-Proctor, the son of Reynolds and the grandson of Lopez.

19. RJS did not live with or at the homes of any of the plaintiffs, nor had he for a significant period of time.

20. On May 12, 2017, deputies, wearing plainclothes, but with marked raid vests on, went to the Reynolds home at approximately 4:00 a.m. and banged loudly on the front door. Reynolds' husband admitted approximately four officers to the home. The deputies went through and searched the home with their flashlights, including the bedroom in which Reynolds was still sleeping. Reynolds was awakened by the deputies' flashlights trained on her face.

21. The deputies stated they were looking for her son, RJS, but would not say why they were looking for him. Neither Reynolds nor her husband was able to tell the officers their son's location. The deputies left the home at that point.

22. By that afternoon, as a result of numerous phone calls, Basquez-Proctor, Lopez, and Reynolds were aware of the fact that RJS was sought in connection with a double homicide and they decided to hire an attorney to represent him with the intention that the attorney would be able to both arrange the safe surrender of RJS and represent him in the event of any criminal charges. Lopez, Reynolds, and other family members spent that afternoon gathering money and meeting with an attorney.

23. While other members of her family were meeting with an attorney, Basquez-Proctor stayed with her son and three other younger members of the family at Lopez's house. Deputies called Basquez-Proctor on her cell phone and demanded that she meet with them immediately, and stated that if she refused to do so, then she and her family would be arrested. Basquez-Proctor explained that she was unable to meet at that time because she was caring for her son and babysitting other young children.

24. At all relevant times, none of the plaintiffs knew of RJS's location, including whether or not he was in Sacramento, San Francisco or Reno, which were locations regarding which the deputies' questions had focused.

25. When her family returned to the Lopez home, Basquez-Proctor relayed her conversation with the deputies and her fear that she was going to be arrested. She asked her

father if she could spend the night at her parents' home and asked him to follow her in a separate car to her home so that she could pick up the items she needed for her son.

26. Basquez-Proctor, her son and her father went to her home and deputies arrived at her door shortly thereafter.

27. The deputies asked if they could search her house, to which she agreed. They questioned her about RJS's whereabouts and his social circle. She truthfully denied knowledge of his whereabouts and explained that she is five years older than her half-brother and did not regularly socialize with him or know his friends. Basquez-Proctor's father was asked similar questions regarding RJS's whereabouts, which he was similarly unable to answer to the deputies' satisfaction. Up to this point, the interaction between the deputies and Basquez-Proctor in her home had been strained, though cordial. It was then that Detective Lemus arrived and the uncomfortable situation became much uglier.

28. First, Lemus confiscated Basquez-Proctor's cell phone and began searching its data. This was more than two hours before the subsequent search warrants for cell phones were signed.

29. Lemus told Basquez-Proctor that she needed to talk to him outside. She complied and Lemus placed her in an unmarked van. She was not yet handcuffed.

30. While in the van, Lemus continued questioning her, asking the same substantive questions that she had already answered, and adding threats that she would go to jail and that he would have CPS take her son, whom she would "never see again" if she did not tell Lemus what he wanted to know. When Basquez-Proctor continued to give the same answers, he told her that she was a "liar," that "two bastard kids are dead" as a result of her half-brother's actions and that she was under arrest and going to jail. He then handcuffed her.

31. Basquez-Proctor's father had gone outside, carrying her son, and learned that she was being arrested. He asked Lemus why she was being arrested, and Lemus refused to answer. Her father was *not* arrested, despite having given the same substantive responses to

the same questions. Before being driven away, Basquez-Proctor was able to yell some instructions to her father about what was needed to be done to care for her son.

32. Rather than to the jail, Basquez-Proctor was taken in the van back to her grandmother's (Lopez's) house.

33. There were a number of other officers already at the Lopez home. Lopez, her husband, and Reynolds were all inside. As soon as Lopez had opened the front door, the officers brushed by her and started searching her house without asking for or receiving her consent. They did not have a warrant.

34. Lopez was questioned, handcuffed, and initially placed in a grey van before being transferred to the same van carrying her granddaughter, Basquez-Proctor.

35. While Lopez and Basquez-Proctor were both in the van, the deputies again asked them the same questions about RJS's whereabouts and contacts. The women gave the same answers they had previously given.

36. As Lopez was being questioned outside of her home, Reynolds was re-contacted inside the Lopez home by the detectives. At least one of the deputies had been to Reynolds' home earlier that morning. That officer, a tall, heavyset white male, had been both aggressive in his questioning and scornful of Reynolds' responses. Reynolds truthfully told deputies she did not know where her son was. When she suggested, as she had been directed to do, that deputies should call RJS's attorney, she was met with a response of "Fuck him. What the fuck is he going to do for you? You're going to jail. Who the fuck does he think he is?" Additionally, the deputy shared his opinion that the act of obtaining a lawyer for her son showed that the family "had no morals". Reynolds was handcuffed. The deputy seized and started searching her cell phone. She was taken out and placed in the second (grey) van.

37. Instead of taking Lopez, Reynolds, and Basquez-Proctor to the jail, the deputies convoyed in the two vans, and with other vehicles, to the Land Park Bowling Alley on Freeport Boulevard. There, the three plaintiffs, still handcuffed, were removed from the two vans. This display was witnessed by a number of people who knew the family, and was

done with the intent that news of the arrest of RJS's female relatives be spread. In the bowling alley parking lot, in addition to sheriff's deputies, there may have been uniformed Sacramento Police Department officers present who were directly involved in this portion of the incident. Reynolds' brother, who is Lopez's grandson and the uncle of Basquez-Proctor and RJS, was brought out of the bowling alley handcuffed. After showing him the handcuffed plaintiffs, the deputies/officers asked him about his nephew's whereabouts, which he was likewise unable to provide. As if to underscore the fact that the women closest to RJS were being held hostage, neither the uncle, nor any of the other male relatives were arrested.

38. The three hostages were finally taken to the Sacramento County Jail where they arrived shortly before 11:00 p.m. on May 12, 2017. The jail paperwork identifies Michael French as the arresting officer.

39. Sometime after the plaintiffs' arrest but before their eventual arrival at the jail, a search warrant was obtained by Detective Burnette for the cell phones that the deputies had already gone through. The warrant implies the involvement of Sacramento County Deputy District Attorney Rod Norgaard; however, at this point, plaintiffs lack sufficient information to determine whether or not Norgaard's involvement as to the interrogations, the search and the arrests was such that he should be added as a defendant in this action.

40. All three hostages spent Mother's Day, May 14, 2017, together in jail, albeit in separate cells.

41. While in the jail, Reynolds did not receive her necessary prescription medications, which caused her significant distress. The failure to receive these medications, as well as her physical response to being arrested and jailed, required her medications to be adjusted after she was released.

42. On the night of May 14, 2017, a bail of $100,000.00 was posted by Lopez's husband to obtain her release from custody.

43. Basquez-Proctor and Reynolds were released from the jail on the evening of May 16, 2017.

44. No criminal charges were filed against the plaintiffs.

45. On May 17, 2017, the Sacramento County Sheriff's Department issued "Detention Certificates" pursuant to California Penal Code Section 851.6(b) to each plaintiff in an attempt to create a legal fiction that what the women experienced was "a detention only, not an arrest."

46. This incident caused Basquez-Proctor to have employment problems for most of the following year.

47. On May 13, 2017, RJS called the sheriff's department and advised them that he was going to surrender himself at the lightrail station on 65th Street, which he chose due to his knowledge of video cameras being at that location, even though his attorney had already arranged for him to voluntarily surrender to the Sacramento County Sheriff's Department on Monday morning, May 15. The deputies' strategy of holding his female relatives hostage apparently had the desired impact of accelerating RJS's surrender as he turned himself in two days earlier than planned. Despite the fact that RJS was in custody as of May 13, the three hostages nevertheless remained in jail. Two of them were held for the maximum time allowed in the absence of having criminal charges filed against them.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Unreasonable Seizure/False Arrest**
**(Violation of the Fourth Amendment to the U.S. Constitution:**
**Actionable under 42 U.S.C. §1983)**
*(Brought by all plaintiffs against defendants French, Lemus and Does 1-5)*

48. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 47, as though fully set forth herein.

49. The actions of defendants French, Lemus and Does 1-5 as alleged herein, including but not limited to arresting plaintiffs without a warrant and without probable cause, interfered with the exercise and enjoyment of plaintiffs' civil rights as guaranteed by the Fourth Amendment to the U.S. Constitution. Specifically, defendants unreasonably seized plaintiffs and interfered with their rights by putting them in fear of their lives, handcuffing and arresting

them, and taking them to jail without legal cause.

50. As a direct and proximate result of said acts and/or omissions by defendants, plaintiffs suffered unreasonable interference with their personal liberty, emotional distress and other injuries.

51. The aforementioned acts and/or omissions of said defendants were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiffs' rights entitling plaintiffs to an award of exemplary and punitive damages, attorney fees and costs.

## SECOND CAUSE OF ACTION
### Hostage Taking/Terrorizing
### Substantive Due Process
**(Violation of the 14th Amendment to the United States Constitution Actionable under 42 U.S.C. § 1983)**
*(Brought by all plaintiffs against defendants French, Lemus and Does 1-10)*

52. Plaintiffs re-allege and incorporate by reference paragraphs 1 to 51 as though fully set forth herein.

53. The conduct of defendants French, Lemus and Does 1-10 as alleged herein, including, but not limited to, unreasonably seizing plaintiffs and interfering with their rights by interrogations, coupled with the threats of arresting family members if they refused to tell them what they wanted to hear, threatening them with the interference/loss of familial relationships including all parental rights if they refused to tell the deputies what they wanted to hear, handcuffing them, parading them, arresting them, and taking them to jail to be used as hostages but without legal cause, violated their right to substantive due process because the deputies had ample time to deliberate at every stage of the encounter and nevertheless violated plaintiffs' rights with the conscience-shocking behavior described herein.

54. As a direct and proximate result of said acts and/or omissions by defendants, plaintiffs suffered unreasonable interference with their personal liberty, emotional distress and other injuries.

55. The aforementioned acts and/or omissions of said defendants were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiffs'

rights entitling plaintiffs to an award of exemplary and punitive damages, attorney fees and costs.

### THIRD CAUSE OF ACTION
**Unreasonable Warrantless Residential Search**
**(Violation of the Fourth Amendment to the U.S. Constitution:**
**Actionable under 42 U.S.C. §1983)**
*(Brought by plaintiff Lopez against defendants French, Lemus and Does 1-5)*

56. Plaintiffs re-allege and incorporate by reference paragraphs 1 to 55 as though fully set forth herein.

57. The conduct of defendants French, Lemus and Does 1-5 as alleged herein, in searching Lopez's home without a warrant and without consent, constituted an illegal search.

58. As a direct and proximate result of said acts and/or omissions by defendants, plaintiff Lopez suffered unreasonable interference with her personal liberty, emotional distress and other injuries.

59. The aforementioned acts and/or omissions of said defendants were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiff Lopez's rights entitling plaintiff Lopez to an award of exemplary and punitive damages, attorney fees and costs.

### FOURTH CAUSE OF ACTION
**Unreasonable Warrantless Phone Search**
**(Violation of the Fourth Amendment to the U.S. Constitution:**
**Actionable under 42 U.S.C. §1983)**
*(Brought by all plaintiffs against defendants French, Lemus and Does 1-5)*

60. Plaintiffs re-allege and incorporate by reference paragraphs 1 to 59 as though fully set forth herein.

61. The conduct of defendants French, Lemus and Does 1-5 as alleged herein, in searching plaintiffs' cell phones without a warrant and without consent, constituted an illegal search.

62. As a direct and proximate result of said acts and/or omissions by defendants, plaintiffs suffered unreasonable interference with their privacy rights, emotional distress and other injuries.

63. The aforementioned acts and/or omissions of said defendants were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiffs' rights entitling plaintiffs to an award of exemplary and punitive damages, attorney fees and costs.

### FIFTH CAUSE OF ACTION
#### Unreasonable Seizure
**(Violation of the Cal. Constitution Art. I §§ 1, 7, 13 and Cal. Civil Code § 43: Actionable under Cal. Civil Code § 52.1(b)/Bane Act)**
*(Brought by all plaintiffs against defendants County of Sacramento, French, Lemus and Does 1-5)*

64. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 63 as though fully set forth herein.

65. The actions of defendants French, Lemus and Does 1-5 as alleged herein, including, but not limited to arresting plaintiffs without a warrant and without probable cause, and illegally searching Lopez's home, interfered with the exercise and enjoyment of plaintiffs' civil rights as guaranteed by the California Constitution to be free from unreasonable searches and seizures.

66. In restraining, threatening, and arresting plaintiffs, defendants French, Lemus and Does 1-5, and each of them, acted with the specific intent to deny each plaintiff her liberty. That is, in performing their respective acts, each defendant knowingly acted for a purpose which each defendant knew was improper — using the coercive power of the social apparatus of compulsion and coercion (government) to arrest and incarcerate without legal justification three persons (plaintiffs) in order to "induce" the third party RJS to surrender on account of his familial relationship with each plaintiff and RJS's desire, as each defendant's correctly surmised, to prevent harm to his family members.

67. Defendants' actions also violated the plaintiffs' right to bodily integrity, and further interfered with their personal rights as guaranteed by California Civil Code § 43.

68. As a direct and proximate result of the actions of defendants French, Lemus and Does 1-10, plaintiffs suffered unreasonable interference with their personal liberty, pain and suffering, humiliation, emotional distress, and other injuries.

69. The aforementioned acts and/or omissions of said defendants were willful,

intentional, wanton, reckless, and/or accomplished with a conscious disregard for plaintiffs' rights as secured by Civil Code § 51.2, thereby entitling plaintiffs to an award of punitive damages under § 52(b)(1) and attorneys' fees as requested herein.

70. Defendant County of Sacramento is liable for the injuries caused by said defendants under § 815.2 of the California Government Code.

### SIXTH CLAIM FOR RELIEF
#### False Arrest
#### (State Common Law)
*(Brought by all plaintiffs against Defendants County of Sacramento, French, Lemus and Does 1-5)*

71. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 70 as though fully set forth herein.

72. The aforementioned acts and/or omissions of the defendants as alleged herein, including but not limited to the arrest of plaintiffs without a warrant and without probable cause, constituted a false arrest under California law.

73. As a direct and proximate result of the aforementioned acts, plaintiffs suffered loss of personal liberty and damages as alleged herein.

74. The aforementioned acts and/or omissions of the individually named defendants were malicious, reckless and/or accomplished with a conscious disregard of plaintiffs' rights thereby entitling plaintiffs to an award of exemplary and punitive damages according to proof.

75. Defendant County of Sacramento is vicariously liable for the false arrest caused by its employees and/or agents under § 815.2 of the California Government Code.

### VIII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for the following relief:

1. For compensatory, general, nominal and special damages against each defendant, jointly and severally, in the amount proven at trial;

2. For punitive and exemplary damages against each defendant in an amount appropriate to punish defendants and deter others from engaging in similar misconduct, as allowed by law;

3. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper; and

4. For costs and reasonable attorneys' fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by statute or law.

Dated: May 9, 2018                              Respectfully submitted,

                                               /s/ Stewart Katz
                                               STEWART KATZ,
                                               Attorney for Plaintiffs

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury.

Dated: May 9, 2018

                                               /s/ Stewart Katz
                                             STEWART KATZ,
                                             Attorney for Plaintiffs